## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  05-0367 (RMC)** |
| | : | |
| **JARON BRICE,** | : | **Judge: Rosemary M. Collyer** |
| | : | |
| **Defendant.** | : | **Sentencing Date: July 6, 2006** |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this memorandum in aid of sentencing.

## INTRODUCTION

Defendant Jaron Brice was found guilty after a jury trial of numerous federal and District of Columbia offenses in connection with his trafficking of one juvenile and one adult for the purpose of prostitution.  More specifically, the defendant was found guilty of Count One of the Indictment, Sex Trafficking of Children in violation of 18 U.S.C. § 1591; Counts Five and Six of the Indictment, Transportation of a Minor for Prostitution in violation of  18 U.S.C. § 2423(a); Count Eight of the Indictment, Transportation of a Person for Prostitution in violation of 18 U.S.C. § 2421; Counts Eleven through Thirteen of the Indictment, First Degree Child Sexual Abuse in violation of 22 D.C.C. § 3008; and Counts Fifteen through Seventeen of the Indictment, Pandering in violation of 22 D.C.C. § 2705.  He was acquitted of Count Four of the Indictment, Sex Trafficking by Force in violation of 18 U.S.C. § 1591, and Count Nine of the Indictment, Transportation of a Person for

Prostitution, in violation of 18 U.S.C. § 2421.[1]   The United States Probation Office prepared a Presentence Investigation Report ("PSR") and concluded that the defendant is eligible for a sentence of life.  (PSR at 18).[2]

The United States requests that this Court impose a sentence within a correctly calculated range under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.").   The Government believes that applying the applicable Guideline provisions will result in an appropriate sentence for the defendant.  The applicable Guideline provisions take into account the extremely serious nature of the offense conduct at issue in this case and are designed to, and will, yield a very substantial and appropriate sentence.

The PSR finds that the total offense level for the defendant's conduct is 46 and that he has a criminal history category of II.  Based on these calculations, the guideline range for imprisonment is life.  To impose a life sentence, the Court must run the sentences on certain counts consecutively (PSR at page 18; Guideline § 5G1.2(d)) as the defendant was acquitted on count Two of the Indictment, Sex Trafficking by Force, Fraud, or Coercion, which provides a maximum sentence of life.[3]  The Government notes that the defense challenges certain of the PSR calculations on the

---

[1]     A number of counts in the Indictment were not presented to the jury and will be dismissed by the government at sentencing.  Thus, the counts of conviction, as found by the jury, are the following: Count One (Indictment Count One), Count Three through Five (Indictment Counts Five, Six, and Eight), and Counts Seven through Eleven (Counts Eleven, Twelve, Thirteen, Fifteen, and Seventeen of the Indictment).  The jury acquitted on Count Two (Count Four of the Indictment) and Count Six (Count Nine of the Indictment).

[2]     The procedural history and facts of this case are set forth in the Presentence Report ("PSR").

[3]     The defendant was indicted on two counts (Counts Two and Four of the Indictment) that carry a maximum sentence of life in jail.   Both of these counts allege a violation of 18 U.S.C. § 1591 (sex trafficking by force, fraud, and coercion).  Count Two, which involved

ground that the PSR's sentencing calculations take into account uncharged and acquitted conduct. However, for purposes of applying the Guidelines, the court can make its own factual determinations based on its assessment of the evidence presented at trial and can use those facts, including uncharged and acquitted conduct, that it determines were shown by a preponderance of the evidence. United States v. Watts, 519 U.S. 148, 157 (1997) (per curiam); United States v. Boney, 977 F.2d 624, 635-636 (D.C. Cir. 1992); United States v. Edwards, 2006 WL 894974 (D.D.C. 4/7/06).

As discussed below, the Government's trial evidence established, by at least a preponderance of the evidence, the facts which support the PSR's Guideline analysis. Moreover, while the Government supports the PSR's calculations as legally and factually correct, should the Court disagree with any of the PSR's recommended calculations, the Government maintains that the ultimate sentence should be substantial and thus, conform with the sentencing factors set forth in 18 U.S.C. § 3553(a).

## ARGUMENT

### I.    Sentencing Standards

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Sixth Amendment, as construed in Blakely v. Washington, 532 U.S. 296 (2004), applies to the federal Sentencing Guidelines. Accordingly, the Supreme Court "imposed a global remedy for the Sixth Amendment difficulties with the Sentencing Guidelines, invalidating their mandatory application and instead requiring district courts to consult them in an advisory fashion." United States v. Labastida-Segura, 396 F.3d 1140, 1142 (10th Cir. 2005). Although the judge must also weigh the

---

K.H., was dismissed before trial.    The jury acquitted the defendant of Count Four, which involved Shakita Proctor.

factors enunciated in 18 U.S.C. § 3553(a), "it is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a sentencing judge." United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005). "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence." United States v. Doe, 412 F. Supp.2d 87, 90 (D.D.C. 2006).

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

Id. (quoting United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005)). In the wake of Booker, several federal circuit courts have held that a sentence within the properly calculated Guidelines range is presumptively reasonable.[4]

In making the factual findings necessary for applying the Guidelines, judges should use the preponderance of the evidence standard of proof and are authorized to consider acquitted or uncharged conduct so long as the evidence was shown by a preponderance of evidence. In United States v. Watts, 519 U.S. 148 (1997) (per curiam), the Supreme Court held that a sentencing court may consider acquitted conduct so long as that conduct has been proved by a preponderance of the evidence. The court explained that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." Id. at 155 (quoting

---

[4] See United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006); United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006); United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006); United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005); United States v. Lincoln, 413 F.2d 716, 717 (8th Cir.), cert. denied, 126 S. Ct. 840 (2005). See also United States v. Cooper, 437 F.3d 324, 330-31 (3rd Cir. 2006) ("While we review for reasonableness whether a sentence lies within or outside the applicable guidelines range . . . it is less likely that a within-guidelines sentence, as opposed to an outside guidelines sentence, will be unreasonable.").

United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)).  Accord Nichols v.

United States, 511 U.S. 738, 747 (1994) (sentencing courts have traditionally and constitutionally

"considered a defendant's past criminal behavior, even if no conviction resulted from that

behavior.") (citation omitted)); United States v. Boney, 977 F.2d 624, 635-636 (D.C. Cir. 1992).

See also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the

background, character, and conduct of a person convicted of an offense which a court of the United

States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G.

§ 1B1.1 n.1(H) (the term "offense" means the offense of conviction and all relevant conduct);

U.S.S.G. § 1B1.3(a)(1) (relevant conduct consists of "all acts or omissions committed, aided,

abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"); U.S.S.G.

6A1.3 (stating that the sentencing court's fact finding should apply a preponderance-of-the-evidence

standard, and "any information may be considered, so long as it has sufficient indicia of reliability

to support its probable accuracy").

        Booker did not change the well established law regarding use of acquitted conduct in

sentencing determinations.  Booker made only one change in the United States Sentencing

Guidelines: they are advisory rather than mandatory.  Booker made clear, however, that a sentencing

court "must consult [the] Guidelines and take them into account when sentencing."  Booker 543 U.S.

at 264.  The defendant's attack on the use of acquitted conduct at sentencing finds no support in

Booker.   In fact, as D.C. District Court Judge John Bates notes, "Booker itself provides strong

support for enhancement of sentences based on acquitted conduct."  Edwards, 2006 WL 894974 at

5.  See also Booker, 543 U.S. at 233 ("when a trial judge exercises his discretion to select a specific

sentence within a defined range, the defendant has no right to a jury determination of the facts that

the judge deems relevant").   Booker requires consultation of the Guidelines, and the Guidelines

require judicial fact-finding by a preponderance of the evidence and endorse the consideration of

acquitted conduct.   Section 1b1.2(b) of the Guidelines specifically provides that a sentencing court,

after it determines the offense conduct, is to determine "relevant conduct," as defined in U.S.S.G.

§ 1B1.3.   Moreover, the commentary to U.S.S.G. § 6A1.3 states that the sentencing court's fact-

finding should apply a preponderance-of-the evidence standard, and that acquitted conduct may be

considered as long as it meets that standard.  Nothing in Booker altered the analysis of Boney, supra,

or Watts.  Every circuit that has reviewed the issue,[5] as well as D.C. District Judge Bates in United

States v. Edwards, 2006 WL 894974 (D.D.C. 4/7/06), has ruled that "Booker leaves intact the long-

standing authority of the sentencing judge to consider acquitted conduct proved by a preponderance

of the evidence" and such practice does not violate the Fifth or Sixth Amendments so long as the

sentence does not exceed the statutory maximum.  Id. at *1.[6]

---

[5]     See, e.g., United States v. Rico, 2006 WL 1477600 at *1 (9th Cir. May 26, 2006)
(stating that Watts is still good law post-Booker, and therefore a sentencing court can consider
acquitted conduct if found by a preponderance of the evidence); United States v. High Elk, 442
F.3d 622, 625 (8th Cir. 2006) ("Even post-Booker, for purposes of calculating the advisory
guidelines range, the district court may find by a preponderance of the evidence facts regarding
conduct for which the defendant was acquitted") (citing United States v. Radtke, 415 F.3d 826,
844 (8th Cir. 2005); United States v. Ashworth, 2005 WL 1670249 at * 2 (4th Cir. July 19, 2005)
states that post Booker, acquitted conduct may be used at sentencing if it is found by a
preponderance of the evidence; United States v. (Derek) Vaughn, 430 F.3d 518, 525-527 (2d Cir.
2005); United States v. Magallanez, 408 F.3d 672, 684-685 (10th Cir.), cert. denied, 126 S.Ct.
468 (2005);  United States v. Duncan, 400 F.3d 1297, 1304-1305 (11th Cir.), cert. denied,, 126 S.
Ct. 432 (2005).

[6]     The government acknowledges that there are a small number of district court
judges, including D.C. District Court Judge Paul L. Friedman in United States v. Baldwin, 389
F.Supp. 2d 1 (D.D.C.2005), that have ruled that enhancements in a Guideline calculation based
on acquitted conduct subjected to the lesser preponderance of the evidence standard are
inconsistent with the Sixth Amendment right to a trial by a jury.  However as noted above, the
overwhelming weight of legal and statutory authority handed down before the Guidelines existed

post-Booker, has held that a district court may still consider acquitted conduct while applying the Guidelines in an advisory manner.

As for the second step of the Booker sentencing analysis, when weighing the § 3553(a) factors as part of its calculation of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence (1) reflects the seriousness of the offense; (2) promotes respect for the law; (3) provides just punishment; (4) affords adequate deterrence; (5) protects the public; and (6) effectively provides the defendant with needed educational or vocational training and medical care.  See 18 U.S.C. § 3553(a)(1) and (2).

## II.     Guideline Calculation

### A.     The Government's Objections

The government has no substantive objection to the PRS's Guideline calculation.  The government notes that there is an error in paragraph 20 of the PSR.  Count One alleges "Sex Trafficking of Children," not, as the PSR states, "Sex Trafficking of Children **by Force, Fraud, or Coercion** (emphasis added)."

### B.     The Defendant's Objections

The defendant makes two primary objections to the PSR – one legal and one factual.  The legal argument is contrary to overwhelming authority and the factual argument is not supported by the evidence presented at trial.

_____

(see Watts, 519 U.S. at 152 noting that use of acquitted conduct was "well established" pre-Guidelines), after the passage of the Guidelines, and even now after the Booker decision holds that "[b]ecause a jury verdict of acquittal does not represent any particular factual finding, it does not preclude the consideration of acquitted conduct at sentencing." Edwards, supra, 2006 WL 894974 at *7, citing Watts, supra, 519 U.S. at 156).

1.    **Legal Objection**

The defendant argues that after <u>United States v. Booker</u>, <u>supra</u>, when making Guideline

determinations, a court can not take into account any conduct for which a defendant was acquitted

or not charged.  According to the defendant, it follows, then, that the court here should not take into

account any evidence regarding the defendant's acts of force, fraud, or coercion relating to Shakita

Proctor because the defendant was acquitted of Count Four of the Indictment (sex trafficking of

Proctor by force, fraud, and coercion in violation of 18 U.S.C. § 1591) and it should not take into

account any evidence of the defendant's acts of force, fraud, or coercion relating to K.H. because the

government dismissed before trial Count Two of the Indictment (sex trafficking of K.H. by force,

fraud, and coercion in violation of 18 U.S.C. § 1591).  The defendant cites two district court opinions

to support of his position regarding use of acquitted conduct and no authority for his position

regarding use of uncharged conduct.

As to the use of uncharged conduct, as discussed above, it is well-settled that uncharged

conduct can serve as a basis for a sentencing determination so long as the sentencing court finds the

existence of such conduct by at least a preponderance of the evidence.  <u>United States v. Smith</u>, 267

F.3d 1154, 1165 (D.C.Cir. 2001).  <u>See also</u> <u>Watts</u>, 519 U.S. at 150 (18 U.S.C. § 3661 "codifies the

longstanding principle that sentencing courts have broad discretion to consider various kinds of

information" in sentencing (<u>citing</u> <u>Williams v. New York</u>, 337 U.S. 241, 247 (1949) ("[h]ighly

relevant – if not essential to [the judge's] selection of an appropriate sentence is the possession of

the fullest information possible concerning the defendant's life and characteristics").

Also, as discussed above, consideration of acquitted conduct at sentencing is permissible

under binding precedents in the D.C. Circuit, <u>Boney</u>, 977 F.2d at 635-636 (D.C. Cir. 1992), and the

8

Supreme Court, Watts, supra, and is also supported by statute, 18 U.S.C. § 3661, and the Sentencing

Guidelines, U.S.S.G. §§ 1B1.1 n. 1(H), 1B1.3(a)(2), U.S.S.G. 6A1.3.

### 2.    **Factual Objection**

The defendant objects to the use of the cross-reference in § 2G1.3(c)(2) for the sentencing

determinations relating the count involving Shakita Proctor and the federal charges relating to K.H.

The § 2G1.3(c)(3) cross reference to § 2A3.1 applies when the offense involved conduct described

in 18 U.S.C. § 2241 (causing another person to engage in a sexual act by using force against that

other person or by threatening or placing that other person in fear that any person will be subjected

to death, serious bodily injury, or kidnapping) or § 2242 (causing another to engage in a sexual act

by threatening or placing that other person in fear (other than by threatening or placing that other

person in fear that any person will be subjected to death, serious bodily injury, or kidnapping).

The facts presented at trial demonstrated by at least a preponderance of the evidence that the

defendant caused K.H. and Shakita proctor to engage in sexual acts, i.e., commercial vaginal and oral

sex, by "using force" against them and "by threatening or placing [them] in fear that [they would]

. . . be subjected to death [or] serious bodily injury," 18 U.S.C. § 2241, and by "threatening or

placing [them] in fear (other than by threatening or placing [them] in fear that [they would] be

subjected to death, serious bodily injury, or kidnapping)."  18 U.S.C. § 2242.[7]

The trial evidence showed at a minimum the following.  K.H. testified that the defendant

convinced her through his words and actions that he loved her and wanted to share his life with her.

She indicated that the defendant encouraged her to believe that once they made enough money, they

---

[7]    All of the government's assertions regarding evidence presented at trial are based
on government counsel's recollection.  The government has not obtained any transcripts from the
trial in this case.

would leave the "game" and buy a house together and that he would take care of her.  Based on this belief, K.H. engaged in sexual acts with the defendant and also with others for his financial benefit, gave him all of the proceeds from her prostitution activity, solicited other females to work for him, engaged in sexual acts with other females solely for the defendant's sexual gratification and also engaged in lesbian sex acts for the defendant's financial benefit.  K.H. also agreed to brand her stomach with a tattoo of the defendant's street name and her status as his supervisory prostitute ("Bird's Bottom").  She ran away from her home and family to be with the defendant, lied for the defendant,  and was arrested for prostitution-related offenses while working for him.

K.H. testified that in addition to prostituting because she loved the defendant and thought that her actions would ensure a life with the defendant, she also testified that she feared him and continued to prostitute for him because she was afraid of him.  She testified that the defendant employed strict rules for her and the other females working for him.  The strict rules created a climate of fear for K.H. and the others.  The females were instructed what to wear, how to walk, what to call each other, what to call themselves, what to say their age was, what to call him, whom to look and not look at, how much time to spend with a "client," how much to charge for specific sex acts, where to engage in sexual acts, which sexual acts to perform, and what to do with the proceeds from the acts of prostitution.  The defendant rewarded the females in his "stable" with attention, sex, drugs, and alcohol, and imposed swift and severe punishment if they did not comply with his rules.  For example, the defendant beat K.H. on several occasions when she violated his "rules."  On one particular night when K.H. violated his rules, the defendant beat K.H., stripped her naked of all her clothing, threated her with a gun, and left her naked in the street.  When K.H. was running away, she fell and injured her leg.  She still has a scar from the fall.  Shakita Proctor

witnessed this assault.  K.H. also testified that the defendant threatened B.G., another prostitute working for the defendant, with a gun when she resisted giving him the proceeds from her prostitution transactions.  His behavior to B.G. further compounded K.H.'s fear of him.

Beyond K.H.'s testimony, Cara Millsap testified that she also prostituted for the defendant when she was 17 years old and that she did so because the defendant was so charismatic and "charming." She saw K.H. prostitute her body for the defendant.  She also saw them in bed together engaging in what appeared to be sexual activity.   Cara testified that the defendant convinced both her and K.H. to create false dates of birth which would indicate that they were over the age of 18. In addition to Cara's testimony, Metropolitan Police Department Officer Max Salazar found K.H. naked and hiding in a hotel bathtub.  The defendant was in the bedroom of the hotel and lied to Officer Salazar by stating that no one else was in the room.  K.H. testified that she lied to the police during the incident, telling them that she had not had sex with the defendant, because she loved the defendant and believed he loved her.

Shakita Proctor testified that initially the defendant manipulated her by making her feel safe and secure.  Based on his behavior, she agreed to prostitute for the defendant, something she had never done before.[8]  She also engaged in lesbian acts pursuant to the defendant's request and direction.  She testified that while working in the D.C. area there were a number of things that made her fear that the defendant would kill her if she left him.  For example, she witnessed the defendant assault K.H. with his fists and a gun on several occasions.  Ms. Proctor testified that another reason she feared the defendant was that she asked him once whether he had ever used the gun that he

---

[8]    K.H. had not prostituted before meeting the defendant.

carried with him and he told her that he had killed someone.  He provided details of that alleged assault.

Ms. Proctor testified that her fear grew tremendously when they moved to Miami because it was there that the defendant regularly physically assaulted her and engaged in a deliberate pattern of denigration and humiliation.  Shakita testified that in Miami the defendant beat her and refused her food while making her fix his meals.  The defendant made Shakita draw his bath and bathe him and made her sleep on the floor while he slept in the bed of the hotel.  When he desired her for sex, the defendant called Shakita from the floor and once he was satisfied, dismissed her from the bed and ordered her back onto the floor.  All of the defendant's actions toward Shakita were to ensure that she continued having sex with other men for his profit.  Shakita testified that as a result of the defendant's actions toward her, she was extremely afraid of him and was afraid that he would kill her if she left him.  In fact, he threatened to kill her if she left him.  As a result of his assaultive behavior, threats, and emotional abuse Ms. Proctor continued to prostitute for him and make all efforts to meet the night quota that he established for her.

During the trial Dr. Lois Lee, who was qualified as an expert in the life of a prostitute and pimp and the relationship between the two, testified that pimps typically utilize several techniques to recruit, control, and manipulate females and to ensure their compliance through threat of death or serious bodily injury.  Through the testimony of K.H. and Shakita Proctor, the jury was able to see how most of the techniques described by Dr. Lee were employed by the defendant.  For example, Dr. Lee stated that  pimps "dominate, control, and abuse" females to ensure that he receives all of the proceeds from the prostitution transactions.   They manage their females through strict rules of conduct, dress, and behavior.  Pimps takes deliberate steps to strip away a girl's self confidence, such

as isolating them by establishing social barriers, and deciding who they can talk to or even look at. Pimps degrade the girls by calling them names, stripping them naked and forcing them to engage in lesbian acts. Pimps also make the girls fear them by demonstrating violence, brandishing guns, issuing threats, and telling stories about other crimes committed and fates befalling other girls who did not conform to their wishes. Each of these strategies which are typically employed by pimps were, according to the testimony elicited during trial, used by the defendant to cause both K.H. and Shakita Proctor to engage in sexual acts with others exclusively and entirely for his profit.

Although the jury acquitted the defendant of sex trafficking of Shakita Proctor "by force, fraud, and coercion," and the government dismissed before trial the count involving sex trafficking of K.H. by force, fraud, and coercion, the evidence regarding force, threat of death, and threat of serious bodily injury was established by a preponderance of the evidence and can properly be considered for sentencing calculations.

3.    **Specific Objections to the PSR**

_____ As noted in the PSR, the defendant objects to a number of the PSR's calculations. The Government will respond to these objections by referencing the paragraph numbers in the final PSR.

_____a.    "Force-related allegations" in Paragraphs 7 and 13-15

The defendant objects to the PSR's finding in paragraph 7 that the defendant took women and girls, including juvenile K.H. and adult Shakita Proctor, across state lines for the purpose of engaging in prostitution, and "used physical force and psychological coercion to cause them to engage in prostitution on his behalf." PSR at 23. He also objects to the "force-related allegations"

in paragraphs 13 through 15.  He asserts that it is improper to consider such evidence as it involves acquitted conduct.  PSR at 24.[9]

As noted above, the law is clear that a sentencing court can consider conduct for which the defendant has been acquitted or not charged so long as the evidence is established by a preponderance of the evidence.  Also as noted above, there was overwhelming evidence presented at trial to support the assertion that the defendant used psychological and physical force to cause K.H. and Shakita Proctor to engage in prostitution for him.

                              b.     Use of the cross-reference from § 2G1.3 and § 2G1.1 to § 2A3.1

The PSR groups together into one unit Counts One and Three (Counts One and Five of the Indictment, Sex Trafficking of the Minor K.H. and Transportation of the minor K.H. across state lines from D.C. to Maryland).  The PSR makes Count Four (Count Six of the Indictment, Transportation of the minor K.H. across state lines from D.C. to New York) and Count Five (Count Eight of the Indictment, Transportation of Shakita Proctor across state lines from D.C. to Maryland) another unit.  The PSR's base offense level calculation for the two K.H. counts begins with U.S.S.G. § 2G1.3 (base offense level of 24) and with U.S.S.G. § 2G1.1 (base offense level of 14).  The PSR then applies the cross-references in § 2G1.3(c)(3) and § 2G1.1(c)(1) and uses § 2A3.1, which has a base offense level of 30.

------

[9]      The PSR represents that the defendant objects to the "force-related allegations" for sentencing of K.H. because the evidence involves "acquitted conduct."  PSR at 24.  There was no "acquitted conduct" relating to K.H..  The jury convicted the defendant on every count involving K.H. and the Court held, pretrial, that evidence relating to the defendant's use of psychological and physical tools was admissible at trial to prove the charges relating to K.H. as they showed how the defendant was able to control, influence, and manipulate K.H. to engage in prostitution and sexual acts with and for him.  Thus, the government assumes that the defendant's precise challenge to the K.H. counts is that after Booker it is improper to consider this evidence because it is uncharged conduct.

14

The defendant objects to the use of the cross-reference from U.S.S.G. § 2G1.3 and § 2G1.1 to § 2A3.1. PSR at 24. The § 2G1.3(c)(3) and § 2G1.1(c)(1) cross references to § 2A3.1 apply when the "offense involved conduct described in 18 U.S.C. § 2241 (causing another to engage in a sexual act by using force against that other person or by threatening or placing that other person her fear that any person will be subjected to death, serious bodily injury, or kidnapping) or § 2242 (causing another to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping).

The facts presented at trial, as outlined above, demonstrated by at least a preponderance of the evidence that the defendant caused K.H. and Shakita Proctor to engage in sexual acts, i.e., commercial vaginal and oral sex, by "using force" against them and "by threatening or placing [them] in fear that [they would] be subjected to death [or] serious bodily injury," 18 U.S.C. § 2241, and by "threatening or placing [them] in fear (other than by threatening or placing [them] in fear that [they would] be subjected to death, serious bodily injury, or kidnapping)." 18 U.S.C. § 2242. At a minimum, K.H. and Shakita Proctor testified that the defendant physically assaulted K.H. a number of times with a gun and his fists when she did not comply with his rules. Both testified that these acts made them very fearful of him. This evidence, alone, justifies the application of the cross reference in § 2G1.3(c)(3) and § 2G1.1(c)(1). See § 2G1.3 n. 5(B)(1) and § 2G1.1 n. 4(a) ("this provision, [18 U.S.C. 2241], would apply, for example, if any dangerous weapon was used or brandished"). The other evidence supporting application of these cross references is outlined above. There are additional facts, outlined above, that likewise support the use of this cross-reference.

   c.    Four-Level Enhancement under U.S.S.G. § 2A3.1(b)(1)

The PSR applies a four-level enhancement under U.S.S.G. § 2A3.1(b)(1) because the offense involved conduct described in 18 U.S.C. § 2241. The defendant objects to this four-level enhancement because "he was acquitted of the counts that charged him with force, fraud, or coercion." PSR at 24. As noted above, there was evidence presented at trial that showed by at least a preponderance of the evidence that the defendant's actions to K.H., Shakita Proctor, and others (which were witnessed by K.H. and Shakita Proctor) created a climate of fear of serious bodily injury or death to K.H. and Shakita Proctor. Based on this evidence, it is appropriate to apply a four-level enhancement under U.S.S.G. § 2A3.1(b)(1) because the defendant caused K.H. and Shakita Proctor to engage in sex acts "by using force against [them] and by threatening or placing [them] in fear that [they would] be subjected to death, serious bodily injury, or kidnapping."

### d.     Two-Level Enhancement under U.S.S.G. § 2A3.1(b)(4)(B)

The PSR applies a two-level enhancement, under U.S.S.G. § 2A3.1(b)(4)(B), § 1B1.1, comment. (n.l(L)), to each unit because K.H. and Shakita Proctor sustained "serious bodily injury."[10] The defendant objects to this two-level increase for the same reason articulated above. The government's response is likewise the same, i.e., that the Court can take into account evidence presented at trial, established by a preponderance of the evidence, that the defendant engaged in conduct constituting criminal sexual abuse under 18 U.S.C. §§ 2241 and 2242 and, thus, the two-level enhancement is appropriate.

## III.    Application of the Factors in 18 U.S.C. § 3553(a)(1) and (2)

### A.  Nature and circumstances of the offense and history of the defendant

---

[10]     Under U.S.S.G. § 1B1.1, comment. (n.l(L)), "serious bodily injury" "is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law."

16

The evidence presented at trial established that the defendant lured K.H., a fourteen-year-old female, and Shakita Proctor, a nineteen-year-old adult, into the life of prostitution. Neither had prostituted before meeting the defendant. Both were at vulnerable periods of their lives.[11] Both were convinced by him to subject their bodies to the sexual pleasure of numerous anonymous men each night, to have regular sexual activity with him, and to stay with him despite the physical abuse and psychological torture they endured.

The hardship they suffered while with the defendant was presented at trial. K.H. and Ms. Proctor testified that the defendant used psychological coercion to make them believe that he loved them, would protect them, and would be their family. They believed his words. They also testified to the physical assaults he inflicted upon them when they deviated from his strict rules. The defendant physically abused K.H. on numerous occasions with his fists and threatened her with a gun. The defendant beat Ms. Proctor and threatened to kill her if she left him. While under his enchantment, both females recruited other women into their "life" with the defendant. Both subjected themselves to the constant and potentially life-threatening dangers of the street.

Like all sexual abuse victims, the effects of the defendant's actions on K.H. and Ms. Proctor may not be full apparent for years to come.[12] At the hands of Jaron Brice, K.H. has experienced life

---

[11]    The defendant met and recruited K.H. at a party where she was naked and had engaged in sexual acts with strangers. She had run away from home and was seeking security, attention, and affection. Shakita Proctor was also at a crossroads in that she was unable to find work and desperate to do so.

[12]    Child sexual abuse (hereafter, "CSA") is a horrible epidemic plaguing this nation's children, evidenced by disturbing studies which reveal that as many as 62 % of women have experienced CSA. See Joseph H. Beitchman, et al., A Review of the Long-Term Effects of Child Sexual Abuse, 16 Child Abuse & Neglect 101, 115 (1992). The short and long-term effects of CSA are both devastating and pervasive. The most common short-term effect can be summarized as the development of some type of inappropriate sexual or sexualized behavior.

as no child should know it.  UNICEF characterizes child prostitution as "one of the gravest infringements of rights that children can endure.[13]  Unfortunately, K.H's experience is not an anomaly.  Although comprehensive research to document the number of children engaged in prostitution in the United States is lacking, it is estimated that about 293,000 American youth are currently at risk of becoming victims of commercial sexual exploitation.[14]  On average, girls engage in prostitution between the ages of 12 and 14 and boys between 11 and 13.  Of the girls living on the street, 55% engage in formal prostitution, with 75% of these girls working for pimps.[15]  Pimp-

---

See Beitchman et al., A Review of the Short-Term Effects of Child Sexual Abuse, 15 Child Abuse & Neglect 537, 552 (1991).  This behavior is marked by the child's heightened interest in and preoccupation with sexuality, and may be evidenced by sexual play, masturbation, seductive or sexually aggressive behavior, and/or age-inappropriate sexual knowledge.  Id.  The long-term effects of CSA are those behaviors, attitudes or opinions embodied or displayed by the victim many years after the abuse.  See Vander Mey & Neff, supra.  The most common long-term effect of CSA is sexual disturbance or dysfunction.  See Beitchman et al., A Review of the Long-Term Effects of Child Sexual Abuse, supra, at 103.  Anxiety, fear, and depression are also commonly cited long-term effects of CSA, especially where force or threat of force was involved in the abuse.  Id.  Women who are victims of CSA are also more likely to be revictimized.  Id. Revictimization means that adult and teenage survivors of CSA are more likely to experience abusive relationships and/or be raped due to their CSA-induced low self-esteem, idealization of men, and oversexualization.  Id. at 108.  Other long-term effects include: guilt, mistrust in relationships, and possibly even post-traumatic stress disorder.  See David Spiegel, Suffer the Children, Society, May-June 2000, at 18, 19.  Finally, adult and teenaged CSA victims are more likely to experience the following adult disorders: substance abuse, eating disorders, anxiety disorders, associative disorders, and personality disorders, all of which are highly correlated with suicidality.  See John Read et al., Assessing Suicidality in Adults: Integrating Childhood Trauma as a Major Risk Factor, 32 Professional Psychology: Research and Practice 367 (2001).

[13]     UNICEF. In: The progress of nations. Child rights--the ultimate abuse. New York: UNICEF, 1995.

[14]     Richard J. Estes & Neil A. Weiner, Commercial Sexual Exploitation of Children in the U.S., Canada and Mexico, University of Pennsylvania (2001).

[15]     S. Gottovi, Sex Trafficking of Minors: International Crisis, Federal Response, USA Bulletin (March 2004).

controlled commercial sexual exploitation of children is linked to escort and massage services, private dancing, drinking and photographic clubs, major sporting and recreational events, major cultural events, conventions, and tourist destinations. Once children find themselves on the street and involved in prostitution, they also become more vulnerable to exploitation through sexual assault, physical violence and participation in child pornography.[16]

One of the obvious concerns about prostituted children is that they are at risk of injuries, including rape, as a result of violence from pimps, clients, police, and intimate partners.  Also obvious is that girls who are forced into prostitution are usually physically and emotionally abused into submission. Both of these facts were born out by K.H.'s testimony concerning the violence which the defendant subjected her to.  He regularly beat her and for no apparent reason.  He abused her physically and emotionally to the point where she confused his desires and motivations as her own.  As troubling as her testimony was about these obvious dangers for prostituted children, the less obvious and potentially more serious health concerns that are ever present for children like K.H. are plainly frightening.

Prostituted children are at high risk of many infectious diseases, especially HIV and other sexually transmitted diseases (STDs). Studies have shown that prostituted children are at higher risk of STDs than their adult counterparts because their status as children makes them less able to negotiate the use of condoms by their clients.[17]  "Without use of condoms, the risk of transmission of STDs is high; during one act of unprotected sex with an infected partner, an adolescent girl has

---

[16]     *Female Juvenile Prostitution: Problem and Response (2nd Ed.)*, National Center for Missing and Exploited Children (November 2002).

[17]     Brian M. Wills & Barry S. Levy, <u>Child Prostitution: Global Health Burden, Research Needs, and Interventions</u>, 359 Lancet 2002 1417, 1417-1422 (2002).

a 30% risk of acquiring genital herpes simplex virus and a 50% risk of acquiring gonorrhea."[18]  As indicated in K.H.'s *Comprehensive Integrated Psychiatric Summary Update of November 22, 2005 ("CIPSU"),* which was prepared by Riverside Hospital and submitted previously to the Court, K.H. has a history of gonorrhea, chlamydia and also abortion.  A final health concern for prostituted women and children, like K.H. and Ms. Proctor, is human papillomavirus (HPV), which has garnered much attention of late for its close link with cervical cancer.[19]  Because the risk of developing cervical cancer is associated with a high number of sexual partners and young age at first intercourse, both K.H. and Ms. Proctor, therefore, have an increased risk of cervical cancer as a result of engaging in numerous act of prostitution on behalf of the defendant.  Moreover, because of her young age, K.H. also has "a high risk of being diagnosed at an advanced stage of disease, for which successful treatment is less likely." [20]

Like K.H., a high percentage of prostituted children abuse various substances from tobacco and alcohol to inhalants and opiates.  During her victimization, the defendant provided K.H. with marijuana, alcohol and Ecstacy.  Abuse of these drugs and others increases the risks for prostituted children of overdose and also permanent kidney, liver, and brain damage.[21]  However, one of the most stunning revelations of the defendant's case was the severe damage to K.H.'s mental health as a result of her victimization.  K.H.'s CIPSU indicates that following her victimization by the

---

[18]    Facts in Brief: Teen Sex and Pregnancy, 1999 Alan Guttmacher Inst.

[19]    STD Facts - Human Papillomavirus (HPV), http://www.cdc.gov/STD/HPV/STDFact-HPV.htm

[20]    Facts in Brief, supra note 19.

[21]    Willis, supra note 18, at 1417-1422.

defendant, she suffered from Depressive Disorder, NOS and adolescent onset Conduct Disorder. In fact, the CIPSU indicates that K.H. "expressed a belief that she did not deserve to live" and had urges to "slit her wrists" and "strangle herself with either a shoestring or a belt." CIPSU at 2. Unfortunately, this is common for children who have shared her experience. "Child prostitution often results in serious long-term psychological harm, including anxiety, depression, and behavioral disorders. Prostituted children are also at high risk of suicide and post-traumatic stress disorder."[22] One U.S. study showed that 25 (41%) of 61 pregnant prostituted adolescents reported suicidal ideation or attempts within the past year. Id.

In their victim impact statements, K.H. and Ms. Proctor's simple, yet honest, words express the tremendous impact the defendant's behavior has had and will have on their lives.

Finally, the defendant committed this offense while being on probation for assaulting his then girlfriend. The defendant has not held a steady job and had no source of income except proceeds from the females' prostitution proceeds. He used drugs and gave K.H. and Shakita Proctor drugs and alcohol to further control their actions and increase their dependence on him.

**B.    A significant sentence reflects the seriousness of the offense and will promote respect for the law**

Congress enacted 18 U.S.C. § 1591 in 2001 to address the scourge of the sex trafficking of children and women by force. The statute provides that a defendant convicted underof this offense of trafficking a child over the age of 14 is subject to 40 years imprisonment. Similarly, the sentences for transportation of minors and adults for prostitution under the Mann Act, 18 U.S.C. §§ 2421 and 2423 and for child sexual abuse, 22 D.C.C. § 3008, are likewise severe. The sentence imposed here

_____

[22]    Robert W. Deisher, et al., The Pregnant Adolescent Prostitute, 143 Am. J. Dis. Child. 1162, 1162-1165 (1989).

must not only reflect the horrendous nature of the defendant's crimes, but must also have an especially strong deterrent effect on other potential defendants who choose to use juveniles and young adults for prostitution.

The defendant was able to use his position as an adult to entice a fourteen-year-old run away child, and a vulnerable nineteen-year-old adult with promises of love, affection, clothing, shelter, protection, and money. The defendant was able to sway these females into a life of prostitution which endangered them physically, mentally and emotionally. He treated them as nothing more than chattel which existed exclusively for his financial advancement. It is imperative that this Court send a strong message that our community will not tolerate such exploitation of women and children by imposing a very severe sentence. Unfortunately, offenders like Mr. Brice are now revered in popular culture. Pimps have been elevated to near icon like status and their behavior is being revered in music, television and movies. Accordingly, those individuals who, like Mr. Brice, may be inclined to pursue this particular life of crime as their vocation must be made aware that doing so will subject them to the most severe penalties available.

### C.  A severe sentence will protect the public from further crimes.

The defendant is a dangerous person. He had the ability to entice children and young adults to sell their own bodies for money and then persuaded them to give him all of their money while they did the filthy work. He convinced K.H. that he loved her and wanted to share a life with her. She had sex with him, prostituted for him, and stayed away from her family for him. He used violence and threats to ensure compliance with his rules. Moreover, he required all the women who worked for him to actively recruit similarly vulnerable victims into his world of violence. A severe sentence will ensure that the defendant is off of the street long enough to ensure that he will be unable to

return to his chosen lifestyle and thereby subject other women and children to the exploitation suffered by the victims in this case.

### D. A Substantial Sentence Provides Just Punishment

A very substantial sentence in this case would be consistent with similar cases around the country and, thus, would provide a "just" punishment.

Very few cases involving a pimp and a minor or young adult have gone through a jury trial. Most cases involve a pretrial guilty plea. Such pretrial resolutions avoid revictimization to the victim from having to testify. What follows is a sample of cases known to the government that involve domestic sex trafficking.

Carlos Curtis (Crim. No. 03-533(GK)) was sentenced to life by D.C. District Court Judge Gladys Kessler for prostituting a 12-year-old and a 17-year-old girl, transporting the minors across state lines for prostitution, and possessing child pornography. The convictions resulted from a jury trial. The court found the defendant to be a career offender. The Court stated that a life sentence was necessary to adequately punish the defendant and to protect the public. Unlike the defendant, Curtis did not have sex with either victim but he did arrange for other prostitutes to engage in sexual acts with one of the minor victims and he photographed the sexual activity.

The defendants Gary Gates and Tamisha Heyward, United States v. Gates and Heyward (4/23/04) (D.D.C.), were charged with violating multiple counts of 18 U.S.C. § 1591 (sex trafficking) and 18 U.S.C. § 2422 and § 2423 (transportation of persons, including minors, for prostitution). Defendant Heyward was also charged with violating one count of 18 U.S.C. § 922 (unlawful possession of a firearm) while defendant Gates was charged with two D.C. Code violations of first degree child sexual abuse. Both defendants entered very early pleas. Heyward

23

plead to a violation of 18 U.S.C. § 1591, and Gates pled guilty to four counts 18 U.S.C. § 1591 (sex trafficking of children) and one count in violation of first degree child sexual abuse.  The defendants operated a sex-trafficking and Internet prostitution business from their home, at times using girls as young as 14 to perform sexual acts.  Defendant Gates allegedly beat the women who disobeyed him, and he also sexually assaulted many of the women and provided drugs to support some of the women's addictions.  D.C. District Court Judge Ellen S. Huvelle sentenced defendant Gates to 178 months in prison and defendant Heyward to 108 months in prison.

In United States v. Long, 328 F.3d 655 (D.C. Cir. 2003), a jury found the defendant guilty of two counts of interstate transportation of minors for prostitution in violation of 18 U.S.C. § 2423(a)(2000), and two counts of possession of child pornography.  D.C. District Court Judge Friedman granted the government's request for an upward departure and sentenced the defendant to the maximum sentence permitted under the Guidelines which at that time was 360 months imprisonment.

Wayne Banks, United States v. Banks (N.D. Fla.), pled guilty to interstate sex trafficking of a 17-year-old Toledo girl, intimidating a witness, and conspiracy.   He was sentenced to 40 years imprisonment.

The defendant in United States v. Thompson (8/19/04) (D. Minn.) was charged with transportation of a minor with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423, sexual trafficking of a minor in violation of 18 U.S.C. § 1591 for prostituting two minor females in the Minneapolis, St. Paul areas, and being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).  Defendant Thompson entered a pretrial guilty plea to one count of violating 18 U.S.C. § 2421.  The defendant was sentenced to 65 months in prison.

In United States v. Roberts (6/24/04) (S.D. Fla.), a Hollywood, Florida, police patrolman was arrested in a sting after going to a Miami hotel under the impression that he was about to meet two children brought to the United States to have sex with him. The defendant charged part of the fee on a credit card and met an undercover officer at the hotel a few days later to make a final payment, believing the minors were at the hotel. The two-count indictment charges him with violating 18 U.S.C. § 1591 (sex trafficking of children) and 18 U.S.C. § 2422 (coercion or enticement of a female into prostitution). Roberts was convicted on 1591 and acquitted on 2422 charge. Roberts was sentenced to 37 months in prison. There was no force, violence, or actual sex involved in this case.

The cases United States v. Parsons, United States v. Thomas, United States v. Washington, United States v. Williams and Southwell, United States v. White, United States v. Sutherland, United States v. Scott, United States v. Phillips (5/5/04) (W.D. Okla.) involved nine defendants arising out of a child prostitution investigation. Five defendants entered pleas. Defendant Michael Wayne Thomas pled guilty to various charges involving transportation of minors for prostitution. Sentences ranged from 6 to 240 months.

The charges in United States v. Flores, et al. (W.D. N.C.) stem from the conspiratorial activities of four co-defendants who traveled interstate with the 13-year-old niece of one of the defendants and had the minor child and the female defendant engage in prostitution for money. Charges include conspiracy to transport a minor for the purpose of illegal sexual activity and conspiracy to transport an adult for the purpose of illegal sexual activity. All plead guilty. Sentences ranged from 26 to 235 months.

Maurice Sims, <u>United States v. Sims</u> (N. D. Ga.), transported a 16 year-old girl from El Dorado, Arkansas to Atlanta, Georgia for purposes of prostitution.  Along the route he beat and raped the girl.  Sims was sentenced to 28 years incarceration.

### E.  Restitution

Under 18 U.S.C. § 2259, there is mandatory restitution in this case to K.H.   As set forth in 18 U.S.C. § 2259, the defendant should be ordered to pay restitution to the victims for the "full amount of the victim's losses," which includes: "(A) medical services relating to physical, psychiatric, or psychological care; . . . (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; . . . and (F) any other losses suffered by the victim as a proximate result of the offense."  18 U.S.C. § 2259(b)(3).  The issuance of a restitution order under this section is mandatory; a court may not decline to issue an order of restitution because of "economic circumstances of the defendant," or "the fact that the victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." 18 U.S.C. § 2259(b)(4).

During the pendency of this trial, K.H. received psychiatric care and counseling and was housed by the U.S. Marshal's Service.[23]  The defendant arranged for K.H. to have numerous

---

[23]  The government will work together with the probation officer to gather as complete restitution information as possible from the eligible victims.

Section 2259 provides that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A." 18 U.S.C. § 2259(b)(2).  Section 3664(d)(5) provides, in relevant part, "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  18 U.S.C. § 3664(d)(5).  Accordingly, the government is hereby informing the court, pursuant to 18 U.S.C. § 3664(d)(5), that the victims' losses in this case are not ascertainable by the date 10 days prior to

tattoos placed on her body.  She desires to have these tattoos removed, which may be costly.  A
restitution order is appropriate for these and potentially for other expenses.

### F.  Sex Offender Registration

Counts One, Five, Six, Eleven through Thirteen, and Fifteen through Seventeen of the
Indictment constitute "criminal offense[s] against a victim who is a minor," as that term is
defined in both 42 U.S.C. § 14071(a)(3)(A) and D.C. Code § 22-4002.   As a result, if the Court
elects not to impose a life sentence, upon release from any term of incarceration, the defendant
shall be required to register his address with the Metropolitan Police Department, for purposes of
inclusion in the District of Columbia's sexual offender registry and/or the National Sex Offender
Registry, for a period of at least 10 years after he is released from incarceration and for a
maximum of the remainder of his life.  See 42 U.S.C. §§ 14071(b)(6), 14071(b)(7), 14072; D.C.
Code §§ 22-4001-4002.  The defendant will be required to register in any state, district, or
territory where he is employed, carries on a vocation, or is a student.  See 42 U.S.C. §§
14071(b)(1)(A)(iii), 14071(c).  In addition, if the defendant relocates to another jurisdiction, he
shall immediately notify the jurisdiction where he had previously been residing of the change of
address and, within 10 days of relocating, he shall register his new address with a designated law
enforcement agency in the new jurisdiction.  See 42 U.S.C. §§ 14071(b)(4), 14071(b)(5); D.C.
Code §§ 22-4009.

### G.     Special Conditions of Supervised Release

---

sentencing and the government therefore requests that the Court set a separate date for the final
determination of the victim's losses, within 90 days after the sentencing date.

Pursuant to 18 U.S.C. § 3583 and upon completion of his term of imprisonment, the defendant should be placed on a 15-year term of supervised release. In addition to the ones recommended in the PSR, the government requests that the following special conditions be imposed.

1. The defendant shall not have any unsupervised contact with any minor child, unless the contact has been disclosed to and approved by the U.S. Probation Officer. In determining whether to approve such contacts involving members of the defendant's family, the Probation Officer shall determine if the defendant has notified the persons having custody of any such minors about his conviction in this case and the fact that he is under supervision. If this notification has been made, and if the person having custody consents to the contact, then this condition is not intended to prevent approval of the contact.

2. The defendant shall undergo a sex offender evaluation and participate in any recommended treatment program, including periodic polygraphs, as directed by the probation officer.

## <u>CONCLUSION</u>

Wherefore, based upon the foregoing, the Government respectfully requests that the Court impose a significant sentence which is within a correctly calculated range under the U.S. Sentencing Guidelines.

Respectfully submitted,
KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar Number 451058

28

BY:

_____

SHARON MARCUS-KURN
Assistant United States Attorney
AZ Bar #10970
555 4TH Street, N. W.
Washington, D.C. 20530
(202) 353-9462


_____

MYESHA BRADEN
Trial Attorney
DC Bar No. 461485
Department of Justice
Criminal Division
1400 New York Avenue, NW
Suite 600
Washington, D.C.  20005