# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NO.  05-0367 (RMC) |
| | : | |
| JARON BRICE, | : | Judge: Rosemary M. Collyer |
| | : | |
| Defendant. | : | Sentencing Date: September 15,  2006 |

### GOVERNMENT'S REPLY TO DEFENDANT JARON BRICE'S MEMORANDUM IN AID OF SENTENCING PARTS I AND II AND OBJECTIONS TO PRESENTENCE REPORT

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following reply to defendant Jaron Brice's Memorandum in Aid of Sentencing Part I, filed on August 7, 2006 ("Brice's Memo Part I"), and Objection to Presentence Report and Part II of His Sentencing Memorandum in Aid of Sentencing, filed on August 28, 2006 ("Brice's Memo Part II").  As discussed below, other than one minor modification involving a two-level enhancement under § 2A3.1(b)(4)(B) for "serious bodily injury" inflicted on the victims, discussed in Section at II(A)(4), below, the defendant has not provided any factual or legal basis for rejecting the presentence writer's calculations under the U.S. Sentencing Guidelines ("Guidelines").

## I.      GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMO PART I

Defendant Jaron Brice was convicted of multiple felony counts involving his pimping K.H. and Shakita Proctor and engaging in sexual acts with K.H.  The Presentence Report ("PSR") recommends that the defendant be sentenced to life in prison, as determined under the

Guidelines and 18 U.S.C. § 3553(a).  The defendant has submitted a lengthy memorandum under

18 U.S.C. § 3553(a)(1), including numerous letters and video testimonials from family members

and friends and a report from Carole T. Giunta, Ph.D, to demonstrate his "history and

characteristics."   These individuals proffer that the defendant had an emotionally deprived

background, has good character, and is committed to his family, including his two sons.  Based

on the representations in these letters, the defendant asks the Court to reject the PRS calculations

and sentence the defendant to no more than 120 months incarceration.[1]  The government does not

oppose the Court's consideration of these items[2] but submits that, far from justifying leniency,

they underscore the defendant's lack of good character.  The Court accordingly should not

deviate from the sentence recommend by the PSR.

**A..**    **Letters and Testimonials**

Brice has submitted a number of letters and video testimonials from his friends and

family members attesting to his good character.  It is evident from the letters and testimonials,

however, that their authors are either not aware of or are concealing their knowledge of the

defendant's actual character and the life he has chosen to live.  Not one of the letters or

testimonials comes to grips with the nature of the acts for which the defendant has been

convicted.

---

[1]    In his <u>Memo Part I</u> Brice asks the Court to sentence him to no more than 120 months in jail.  But by his own Sentencing Guideline calculation, <u>Brice's Memo Part II</u> at 5, his sentencing range is 151-188 months.

[2]    The defendant requests that the Court play the DVD of video testimonials at the sentencing hearing.  But doing so will cause unnecessary delay in what will likely be a lengthy hearing.  The government requests instead that the Court review the DVD in chambers prior to the hearing.

Several of the letters and testimonials illustrate this problem quite starkly. For example, defendant's grandmother states that he has provided assistance to her. That may be, but the evidence at trial showed that defendant also used his grandmother's house to have sexual intercourse with 14-year-old K.H. on numerous occasions. Trial Testimony in United States v. Jaron Brice, Docket No. CR 05-367 ("TT") for February 27, 2006, at 104-105.[3] Similarly, although the defendant may have bought his children a truck for Christmas once and hugged them on occasion, there is no evidence that the defendant provided any other support for his children and/or was a consistent, healthy, or positive presence in their lives. To the contrary, testimony at trial showed that defendant introduced his children to K.H., TT for February 27, 2006, at 108, brought his sons with him to the prostitution "track," and openly exposed them to his criminal activity, TT for February 23, 2006 (a.m. session) at 18-19. As Shakita Proctor indicated in her testimony, Mr. Brice openly declared that he wanted his sons to grow up to be pimps and engage in the exact type of criminal activity for which he has been convicted. Id. at 23. These crimes deserve the imposition of a sentence sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), and the defendant has shown nothing to the contrary.

Worse, it appears from defendant's letters and testimonials that he lied to the authors in order to cast his character in a good light. For example, John Himchak opines that the defendant is a "responsible" person, but his opinion is based on false information, supplied to him by the defendant, that in 2004 the defendant "was working a full time job." In fact, Brice's income in 2004 derived from prostitution. Similarly, false information provided by the defendant led

---

[3]    The defendant told Dr. Giunta that living with his grandmother gave him "enough space to explore." As the trial testimony showed, living with his grandmother did, indeed, give him space to explore using drugs, prostituting young women, and having sex with juveniles.

Carole Giunta to conclude that the defendant's victims were already working as prostitutes and strippers when they met him and, thus, that the defendant should face a less severe penalty. The victims testified that they had not prostituted before meeting the defendant and that they got into the business because he told them that he would care for them if they prostituted for him. TT for February 22, 2006 (a.m. session) at pages 58, 76, 87, TT for February 23, 2006 (a.m. session) at pages 113 and 114, TT for February 27, 2006, at 58, 59, 76.

To the degree that the letters do not rely on phony information to reach bogus conclusions, they deserve little weight because they were submitted by members of Brice's family who have a personal and possibly financial interest in the outcome of the sentencing hearing.[4]

## B.    <u>Personal History and Effects of Incarceration</u>

The defendant argues that his unfortunate personal history, including a fractured and unstable childhood nuclear family, an emotionally unsatisfying relationship with his mother, and exposure to criminal activity at an early age somehow makes him less culpable for his crimes. None of these factors is unique to the defendant, none warrants leniency or departure from the Guideline calculation, and none serves to mitigate the criminal conduct in which he engaged.

Likewise, disruption of the defendant's life and the concomitant difficulties for those who depend on him, including his two children, are inherent in incarceration and are not grounds for departure or leniency. In fact the Guidelines specifically state that "[i]n sentencing a defendant convicted of an offense . . . under section 1591, or an offense under chapter . . 117 of title 18,

---

[4]    The information from Lennetta Brown should be viewed with particular caution. K.H. testified that she and the defendant stayed at Brown's house, TT from September 27, 2006, at pages 107-108, and that the defendant stored guns at Brown's house. <u>Id.</u> at 127.

United States Code, family ties and responsibilities and community ties *are not* relevant in determining whether a sentence should be below the applicable guideline range." Guideline Section 5H1.6. (emphasis added). Brice was convicted of violating 18 U.S.C. § 1591 (Count One), and 18 U.S.C. 2423(a) (Counts Three and Four). Thus, these factors can not be a basis for departure and should not be a basis for significant leniency.

Mr. Brice's sons, like all children, need a strong and positive father figure, but defendant hardly seems to be a role model. Moreover, defendant's newly minted claims of parental involvement are belied by the record. The record establishes that Mr. Brice spent much of his time directing and monitoring his prostitutes while his children lived with their mother. This pursuit took him back and forth between the District of Columbia and various cities in Maryland, New York, New Jersey, and Florida. Instead of making an effort to raise his own children with an example of productive citizenship, Mr. Brice chose to exploit other people's children in the commercial sex trade.[5]

In any event, the needs of his two sons are not the focus of Mr. Brice's sentencing hearing. Rather, the issue here is the appropriate penalty for the criminal activities in which the defendant enthusiastically engaged.

## C.    Dr. Giunta's Report

---

[5]    K.H. testified that she was only 14-years-old when Mr. Brice turned her out on the streets to risk her life, mind, and body by having sex with strange men for Brice's financial benefit. K.H. also testified that H.H. was only 15-years old when Mr. Brice exploited her in the same way. Cara Millsap testified that she was barely 17-years-old when Mr. Brice made his living off of her body. Shakita Proctor was only 19-years-old when he brutalized her as part and parcel of his activities to "pimp" her out for prostitution.

The defendant has submitted Dr. Giunta's report in his defense, but in reality the report demonstrates that the defendant exhibits no remorse for his actions and is willing to lie to make himself look good. With respect to the instant offense, Brice falsely told Dr. Giunta that when he met the victims in this case they were already "working at strip clubs and as prostitutes," that he did not act as their pimp, that he did not have sex with K.H., and that he acted as a "safety net" for K.H. by giving her money, rides, and hotel rooms because "it felt good I could help out." These representations are inconsistent with the sworn testimony of every witness at trial and the jury's verdict. The defendant's representations to Dr. Giunta make it obvious that he has failed utterly to accept any responsibility for his behavior and that he lacks a trustworthy character.

Northing in the defendant's history or actions, either as reflected in the letters and testimonials or Dr. Giunta's report, justifies any leniency in this case. He has shown no remorse for his actions. He lied to his friends, family, and Dr. Giunta by blaming the current charges, and his prior conviction, on the victims and by denying all involvement in criminal activity. He was on probation when he committed the instant offenses. Instead of learning from his actions and pursuing legitimate employment and an honorable way of life, he chose a life of criminal behavior and used women and children for his own sexual pleasure, greed, ego, and financial gain. He deserves the strictest possible sentence.

## II.    GOVERNMENT'S REPLY TO BRICE'S MEMO PART II AND OBJECTIONS TO PSR

### A.    With The Exception Of The Two-Level Enhancement For Serious Bodily Injury," The PSR's Sentencing Calculation Is Legally Sound and Should Be Followed

#### 1.    A Sentencing Court May Properly Consider Acquitted Conduct Demonstrated By A Preponderance Of The Evidence And There Are Compelling Reasons To Do So With Respect To The Evidence Relating To

**Shakita Proctor**

Defendant asks this Court not to rely on what he characterizes as "acquitted conduct," i.e., evidence presented at trial that defendant used force and threats to cause Shakita Proctor to engage in prostitution and, thus, not apply the cross-reference in Guideline Section 2G1(c)(3) to Guideline Section 2A3.1 ("the 2G/2A cross reference"). Brice's Memo Part II at 10-12. He gives no legal basis for this request and ignores compelling reasons why the court should consider *all* relevant evidence demonstrated by a preponderance of the evidence, including evidence of force and threats pertaining to Ms. Proctor.

The law in this District is clear that "a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury." United States v. Dorcely, 454 F.3d 366, 371 (D.C. 2006). Dorcely is consistent with every other circuit that has considered the question in the wake of United States  v. Booker, 543 U.S. 220 (2005). Id. Dorcely  also held that a court's use of such evidence does not violate a defendant's due process right under the Fifth Amendment, 454 F.3d at 372, and rejected the claim "that sentencing court's use of acquitted conduct must be based not on a preponderance of the evidence but instead evidence beyond a reasonable doubt." Id.

In addition, although a sentencing judge is not *required* to make use of relevant acquitted conduct demonstrated by a preponderance of the evidence, doing so is the best practice because only thorough consideration of such evidence can the Court fashion the most appropriate sentence.  The Supreme Court has instructed that "[h]ighly relevant – if not essential – to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible

concerning the defendant's life and characteristics." Williams v. New York, 337 U.S. 241, 247

(1949). Accord United States v. Grayson, 438 U.S. 41, 50 (1978) (it is a "fundamental sentencing

principle" that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited

either as to the kind of information he may consider, or the source from which it may come").

Congress has explicitly endorsed this view. "No limitation shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate

sentence." 18 U.S.C. § 2661. The Guidelines themselves, § 1B1.4, reiterate the need to give

sentencing court's broad access to relevant information so it can fashion an appropriate sentence:

> In determining the sentence to impose within the guideline range, or whether to
> depart from the guidelines is warranted, the court may consider, without
> limitation, any information concerning the background, character and conduct of
> the defendant, unless otherwise prohibited by law.

In addition, although application of the Guidelines are no longer mandatory, courts are

encouraged to continue to follow them. As the First Circuit recently explained:

"We . . . believe that the guidelines remain an important consideration in sentencing because they

represent the only integration of the multiple sentencing factors set forth in § 3553(a), often

reflect past practice, and bear the imprimatur of the Sentencing Commission, the expert agency

charged with developing them." United States v. Thurston, 456 F.3d 211, 215 (1st Cir. 2006)

(internal citations omitted). See also United States v. Crosby, 397 F.3d 103, 115 (2nd Cir. 2005)

(a sentencing judge violates 18 U.S.C. § 3553(a) by limiting consideration of the applicable

Guideline range to just those facts found by a jury or admitted by the defendant).

The evidence that the defendant used force and threats with regard to Shakita Proctor is highly relevant to an evaluation of both defendant's character and the conduct for which he was convicted, and therefore should be considered when determining an appropriate sentence. Ms. Proctor testified that the defendant physically assaulted her when she did not comply with his demands. See TT of February 22, 2006 (a.m. session) at 93-94; February 22, 2006 (p.m. session) at 24-26, 30, 91; February 23, 2006 (a.m. session) at 114. He threatened to kill her if she left him. See TT of February 23, 2006 (a.m. session) 46-47. He used a gun in her presence to threaten others, which had the affect of increasing her fear of him.[6] See TT of February 22, 2006 (a.m. session) 24-26, 27-29. She testified that because of the climate of fear he created she did not leave him and, instead, chose to endure his abuse and the abuse inflicted through her prostitution activity. See TT of February 22, 2006 (p.m. session) at 24, 30, 91; February 23, 2006 46-47. The evidence also showed that defendant did not limit his abuse to Shakita Proctor. See TT of February 22, 2006 (p.m. session) at 24-26, 27-29, 30. He treated his two primary sources of money in a similar manner. The evidence of force and threats to Shakita Procter was demonstrated at trial by a preponderance of the evidence and is highly relevant at sentencing.

**2.     The Court Need Not Conduct A Further Evidentiary Hearing To Apply The Cross Reference In Guideline Section 2G1.1(c)(1) To Guideline Section 2A3.1 For Its Evaluation Of The Applicable Sentence For The K.H. Counts**

The defendant claims that the Court cannot rely on evidence adduced at trial that would support a application of the 2G/2A cross reference, i.e., evidence that the defendant forced K.H to engage in prostitution and threatened or placed her in fear that she would be subjected to

---

[6]     The full passages from Ms. Proctor's trial testimony are provided in Attachment A to this pleading.

death, serious bodily injury, or kidnapping unless it conduct an additional evidentiary hearing.

Brice Memo Part II at 12-13.  The claim is that because the government did not pursue at trial the

indicted count charging the defendant with trafficking of K.H. by force, fraud, and coercion, he

did not have the incentive to prove at trial, through cross examination of K.H. or otherwise, that

K.H. participated in prostitution out of fear.  That argument fails because it rests on an incorrect

premise and has no legal support.[7]

Defendant asserts that he had no incentive to cross-examine K.H. to negate use of the

2G/2A cross reference.  But the evidence that supports using the cross-reference  is the very same

evidence that was presented to prove the elements of the charged offenses.  For example, K.H

testified that she saw defendant point a gun at another prostitute when the other prostitute did not

give him her prostitution proceeds.  See TT of September 27, 2006 at 122.  K.H. testified that

seeing this made her scared.  See TT of September 27, 2006 at 122.  In addition, K.H. testified

that the defendant physically assaulted her on several occasions and put a gun to her head.  See

TT of September 27, 2006 at 72 (if broke rules), 124 (repeated beating), 125 (stripped, chased,

beat), 173 (repeatedly hit her in face), 182-83 (put gun to her face).  Although that testimony

fully supports using the 2G/2A cross reference, the government elicited that evidence to show

the methods the defendant used to control and discipline the victims for the purpose of

establishing the defendant's guilt.  See Government's [Pre-Trial] In Limine To Admit Other Act

---

[7]        Defendant cites as his sole legal support United States v. Huerta-Rodriguez, 355
F.Supp. 2d 1019, 1027 (D. Neb. 2005), for the proposition that sentencing enhancing factors
should be demonstrated by a beyond a reasonable doubt standard but that holding is directly
contrary to the law of this District.  See United States v. Dorcely, supra, 454 F.2d at 371 (a
defendant's Fifth and Sixth amendment rights are satisfied when a court makes sentencing
findings based on a preponderance of the evidence standard).

Evidence at 6 (citing United States v. (Levorn) Evans, 285 F.3d 664, 670 (8th Cir. 2002)

(evidence of defendant/pimp's physical assaults to his prostitutes admissible in a Mann Act case

because it shows one way the defendant controlled his prostitutes); United States v. (Monroe)

Evans, 272 F.3d 1069, 1083 (8th Cir. 2002) (defendant/pimp's sexual assault to prostitutes

admissible as direct evidence of the Mann Act charge because it demonstrated actions taken to

recruit, control, and discipline the prostitutes).  Defendant's counsel thus had ample incentive to

cross-examine on this point.

Even if the premise of defendant's argument were correct, it fails on its merits because

contrary to defendant's assertion, his counsel did cross examine K.H. on the issue relevant to the

2G/2A switch, i.e., whether the defendant forced her to engage in prostitution through physical

threats or assaults.  Examples of such cross examination by defense counsel Shawn Moore of

K.H. follows:

Q:     You have testified I believe you told the prosecutor that the first time or the time that you
       left the party with Neisha and B.G. and Mr. Brice that you went to a hotel somewhere, is
       that correct?

 A:     Yes.

Q:     And I think you said that Mr. Brice drove and B.G. was in the front seat and the others
       were in the back seat of this car.  Is that correct?

A:     Yes.

Q:     All right.  Now nobody was forcing you to go anywhere were they?

A:     No.

Q:     Nobody was putting a gun to your head or a knife or anything like that forcing you to go
       anywhere, correct?

A:     Correct.

11

Q:     I think you said that at least, correct me if I'm wrong, but you told the prosecution that Mr. Brice didn't say anything in the car on the way over, correct?

A:     I don't recall him saying anything.

TT at September 27, 2007, at pages 156-157.

Q:     Now the reason among other things that you say you were leaving to go to New York was this was like you said, the day after this incident at the Budget Hotel, right?

A:     Yes.

Q:     It was your idea, you thought I have got to get out of town, is that right?

A:     Yes.

TT at September 27, 2006, at page 166.

Q:     Now also this morning you talked in some detail about him beating you up.  On how many occasions?

A:     Quite a few.

Q:     Okay.  where was it, where would he hit you?

A:     My face.

Q:     Okay.  And when you say quite a few, is that like five, 10, something like that?

A:     Yeah.

Q:     Okay.  And this would occur, I take it from what your saying, in various places?

A:     Yes.

Q:     Well, that's not what you told the grand jury is it?

A:     No.

Q:     As a matter of fact, Ms. Marcus-Kurn specifically asked you about that and page 55, line 14.  She asked you has he every physically assaulted you in any way?  And your response was no, wasn't it?

A:     Yes, it was no.

Q:     You understood her question, correct?

A;     Yes.

Q:     You understood what she's talking about with physically assaulted, correct?

A:     Yes.

Q:     You understood that question included whether he had beaten you up, slapped you, anything of a physical nature.  Correct, right?

A:     Yes.

Q:     All right.  And you also said that perhaps it was this afternoon, that at some point you'd seen him point a gun towards B.G.'s leg?

A:     Yes.

Q:     Or put the gun on B.G.'s leg, and you never said anything like that to the grand jury, did you, putting a gun on B.G.'s leg, did you?

A:     Not in my first testimony.

TT at September 27, 2006 at pages 173-174.

Q:     All right.  You know, ma'am, that it can be a crime to lie to a grand jury, correct?

A:     Yes.

Q:     You've heard the term perjury haven't you?

A:     Yes.

Q:     And you know to perjure oneself is to give a false statement intentionally under oath, correct?

A:     Yes.

TT at September 27, 2006, at 175.

Any failure to cross examine K.H. further on the issue or force or threats likely reflects defense counsel's inability to do so effectively and not, as alleged, on their lack of incentive or reason to do so.

### 3.    The Record Establishes By At Least A Preponderance Facts To Support Use Of The 2G/2A Cross Reference

The government agrees with defendant that to apply the 2G/2A cross reference, the Court must find, by at least a preponderance of the evidence, that with respect to K.H. and Shakita Procter,  18 U.S.C. § 2241(a)(1), Brice "used force against [her]" and, with respect to 18 U.S.C. § 2241(a)(2) that the defendant "threatened or placed [her] in fear that [she would] be subjected to death, serious bodily injury, or kidnapping."[8]

The trial testimony considered as a whole demonstrates by at least a preponderance of the evidence that the defendant's modus operandi was to create a climate of dependence and fear, through physical beatings and threats of physical violence and death, to cause Shakita Procter and K.H. to engage in commercial sexual acts for his financial benefit.  See TT of September 22, 2006 testimony (a.m. session) of Shakita Procter at 93-94 (defendant beat me when he thought Shakita Procter kept prostitution proceeds), 99-100 (defendant beat Shakita Procter if she violated the rules), 106-107 (defendant pulled her hair and K.H.'s hair and made them have sex together); TT of September 22, 2006 testimony (p.m. session) of Shakita Procter at 24 (Shakita Procter felt she couldn't leave because of what she witnessed him do to K.H.), 24-26 (because K.H. cussed at the defendant, he stripped her naked, put a gun to her head, beat her on the face and body), 26 (Shakita Procter saw the defendant with a gun on several occasions), 27-29

---

[8]        The PSR at ¶¶ 21, 30, 39 applied the 2G/2A cross-reference on the finding that the offense involved conduct described in 18 U.S.C. § 2241.

(defendant put a gun to K.H.'s head), 30 (defendant, while holding a gun to her head, threatened to kill K.H.), 30 (defendant said he had beaten other girls with hangers and belts), 30 (defendant beat Shakita Proctor with a belt and pulled her hair), 30-31 (defendant told her he had killed someone in the past), 91 (defendant would not let her stop until he was ready to, he would beat her if she tried to stop early); TT of September 23 (a.m. session) of Shakita Proctor at 46 (Shakita Proctor felt she couldn't leave him), 46-47 (defendant told her that if she ever tried to leave him he would kill her), 114 (after one month of being with the defendant he began to beat her); See TT of September 27, 2006 of K.H. at 72 (defendant would beat K.H. in face if she broke the rules), 122 - 123 (defendant put gun to "B.G.'s" leg when he thought she had kept money from her prostitution activity which scared K.H.), 124 (defendant beat her repeatedly and stayed because he told her he loved her), 125 (defendant beat her repeatedly after stripping her naked), 173 (defendant repeatedly hit her in face), 182-83 (defendant put a gun to her head and told her not to lie, this made her scared).

The defendant claims that this evidence is legally insufficient. He asserts, without legal support, that "as the statutory language of § 2241 and § 2242 makes clear, there must be a direct nexus between the physical assaults and the sexual acts." Brice's Memo Part II at 15. He cites to United States v. Evans, 285 F.3d 664 (8th Cir. 2002) to support his position.[9] The Eighth Circuit upheld the sentencing court's application of the guideline for criminal sexual abuse, § 2A3.1, noting that the following defendant/pimp's attacks on the victim/prostitute the defendant "often would attempt to make up by forcing her to have sex with him." Id. at 672.

_____

[9] The defendant also cites United States v. Banks, 2006 WL 2034639 (unpublished) (11th Cir.). The government has not been able to locate this opinion in Westlaw or otherwise.

Other courts have labored with the fine distinction between cases that involve a pimp's threatening a prostitute to coerce her to stay with him (no cross-reference applied) with those cases that involve a pimp using violence or threats to make a person perform a sexual act (cross reference applies).  See generally United States v. Pipkins, 378 F.3d 1281, 1300-1301 (11th Cir. 2004) (summarizing numerous cases).  But that level of hair splitting is not necessary in this case because the applicable Guideline provisions have changed since the Evans and Pipkins opinions. Guideline Section 2G1.1 was amended by Amendment 664, effective November 1, 2004 (and used in the 2004 and 2005 manuals).  The old Section 2G1.1 had a specific offense characteristic (SOC) for the use of physical force, fraud, or coercion.  This SOC was deleted in its entirety. Amendment 664 created a new 2G1.1 (commercial acts not involving minors) and added a new guideline, Section 2G1.2 (commercial sex acts involving minors).  The new Section 2G1.1 only has a SOC for fraud or coercion, but not force.  In addition, the anticipated use of the cross-reference has expanded in the 2003 and later version of the Guidelines to specifically include those cases " if any dangerous weapon was used or brandished."  See 2G1.1 note 4(A). Although not articulated as such in the Guidelines, the government submits that, as was alluded to in the Pipkins case, there was considerable overlap between the SOC for force and the cross-reference to 18 U.S.C. 2241 in the old Section 2G1.1.  By excluding the word "force" from the SOC, an argument can be made that the Sentencing Commission plainly envisioned the 2G/2A cross-reference to capture all those cases, like this one, involving the use of force.  Brice's use of force and threats to cause Shakita Proctor and K.H. to engage in sexual activity on a repeated basis is an even greater harm than using force and threats to cause someone to engage in sexual

16

activity during a single, specific instance.  Thus, the 2G/2A cross reference is even more appropriate in this case.

Even if the Court were to require a more direct link between the physical assaults and the victims' sex acts the evidence supports this link.  For example, Shakita Proctor testified that the defendant forced her and K.H. to have sex with each other.  Shakita Procter testified to the following:

Q:     Did you and Princess ever engage in sexual acts when the defendant was there?

A:     Yes.

Q:     Could you tell us about how that, why that happened?

A:     Because he knew we weren't really getting along and if he was having sex with me she would make him, he would make her kiss me or lick, kiss on my chest, whatever.

Q:     What would he say to cause this to happen?

A:     He would more so wouldn't say anything.  Just more the way he act.  He would pull her, snatch her by her hair or pull me by my hair and he tell us what to do like he would . . do certain sexual activities.

TT from February 22, 2006 (a.m. session) at pages 106-107.  Shakita Proctor also testified that the defendant would "beat her" if she attempted to stop prostituting before he was ready for her to do so.  She testified to the following:

Q:     Is there a word if you violate the rules?

A:     Out-of-pocket.

Q:     What does that, could you tell us what that phrase means?

A:    Out-of-pocket means if I was to have an attitude with him or get smart with him or if I was to come across another pimp and look at the pimp or some way somehow come in contact with that pimp he would consider that out-of-pocket or if I wasn't making enough money for him that would be out-of-pocket.

Q:    How did you learn that phrase?

A:    He taught me that phrase.

Q:    Were you ever out-of-pocket?

A:    Yes.

Q:    What did he do?

A:    He would beat me for it.

TT from February 22, 2006 (a.m. session) pages 99-100.

Q:    How long was it before you started feeling entrapped as you called it, that's your word?

A:    About a month into it.

Q:    What started happening about a month into it?

A:    He started to smack me, beat me, forced me to go out when I didn't want to.  Wasn't, he wasn't allow me to eat what I wanted to.

Q:    Mr. Moore asked you, suggested that it was easy money and you said it wasn't easy money.  Why was this not an easy way to make money?

A:    Because he had me in high heels, stilettos, revealing clothes and when I wanted to take a break I couldn't.  I was tired, he wouldn't let me go to sleep.  I was forced to go out there and make the money and if I didn't that I would get beaten for it.

TT from February 23, 2006 (a.m. session) pages 113-114.

K.H. also testified that the defendant would assault her if she violated his rules.

18

Q:      You used the term out-of-pocket.  What does that mean out-of-pocket?

A:      Getting smart with them, like breaking any of the rules, getting smart, talking back, looking at another pimp.

Q:      Did you ever go out-of-pocket with the defendant?

A:      Yes.

Q:      What wold happen, what did happen when you went out-of-pocket?

A:      Sometimes I would get hit, got cursed out.

Q:      Who would hit you?

A:      Jaron.

Q:      Where would he hit you?

A:      In my face.

Q:      How did that feel?

A:      Painful.

Page 72.

Shakita Proctor and K.H.'s  testimony establishes by a preponderance of the evidence that the defendant used deliberate tools and techniques including force and threats of bodily injury including death to recruit, seduce, dominate, and control her to engage in repeated acts of sexual abuse with him, customers, and each other.[10]  This evidence fully justifies the application of the 2G/2A cross reference.

### 4.      The Only Impermissible Double Counting Is The Two-Level Enhancement For "Serious Bodily Injury" Under Guideline § 2A3.1(a)

---

[10]      The techniques used by Brice are identical to those outlined by government expert Lois Lee as ones used with such success by pimps around the country.   See Government's Memorandum In Aid of Sentencing at 12-13.

The PSR applies the 2G/2A cross reference for the federal prostitution counts upon a finding that the offenses involved conduct in violation of 18 U.S.C. § 2241 (force and threats). See PSR ¶¶ 21, 30, 39.  The PSR, then, applies a four-level enhancement under Guideline Section 2A3.1(b)(1) because the offense involves conduct described in 18 U.S.C. § 2241, see PSR ¶¶ 22, 31, 40.   Generally, impermissible double counting occurs when identical conduct justifies two upward adjustment.  Double counting is permissible unless the guidelines expressly provide otherwise or a compelling basis exists for implying such a prohibition.  Accord United States v. Wong, 3 F.3d 667, 670 (3d Cir. 1993).  The situation here is not impermissible double counting.  First, here the Guideline calculation involves the use of a cross reference and an upward adjustment or enhancement.  Unlike an enhancement, a cross reference must be read as a whole and "refers to the entire offense guideline (*i.e.*, the base offense level, specific offense characteristics, cross references and special instructions)," Guidelines § 1B1.5(a).  A cross reference "does not 'increase' a defendant's offense level.  It merely sentences him under the offense guideline  which reflects the full scope of his conduct."  United States v. Beith, 407 F.3d 881 (7th Cir. 2005).  Accord United States v. Valdez-Torres, 108 F.3d 385, 389 n. 7 (D.C.Cir. 1997) (rejecting argument that applying proper offense guideline with a higher base offense level may be characterized as "increasing" the base offense level).  Guideline Section § 2A3.1 sets up a graduated adjustment scheme whereby offenses committed by force or threats of death, serious bodily injury, or kidnapping receive a four-level enhancement but those committed by other means (i.e., an intoxicant) do not receive an additional enhancement.

Second, as courts have held, "the bar on double counting comes into play only if the offense itself *necessarily* includes the same conduct as the enhancement."  Id. at 889 (quoting

United States v. Senn, 129 F.3d 886, 897 (7th Cir. 1997) (emphasis added). Here, the cross reference to 2A3.1 applies if either 18 U.S.C. § 2241 or 2242 and not necessarily 2241. Thus, it is not impermissible double counting to use the 2G/2A cross reference and to apply a four-level enhancement under 2A3.1(b)(1). Accord United States v. Wimberly, 60 F.3d 281, 288 (7th Cir. 1995) (not impermissible double counting to apply offense level for criminal sexual assault of an individual under the age of 12 and four-level enhancement because victim was under the age of 12).

The government concedes, however, that the PSR's addition of two additional levels, under Guideline Section 2A3.1(b)(4)(B), see PSR ¶¶ 24, 33, and 41, because the offense involved "serious bodily injury" is impermissible double counting because both involve enhancement in which the same facts were used for both.[11] Accordingly, the Court should not apply the two-level enhancement under Guideline Section 2A3.1(b)(4)(B) for the offenses involving Shakita Proctor or K.H.

**5.** **The Five-Level Enhancement Under Guideline Section § 4B1.5 Is Proper**

---

[11] The only basis for the PSR's application of Guideline Section 2A3.1(b)(4)(B) ("the victim sustained serious bodily injury") is that the definition of "serious bodily injury" is defined in the Guidelines to have occurred "if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or §§ 2242", the very same evidence that was used to support the other § 2A3.1 enhancement.

Guideline Section 4B1.5(b), for "Dangerous Sex Offenders Against Minors,"[12] directs a court to apply a five-level enhancement if three criteria are met. In this case, all three criteria are present and the enhancement is proper.[13]

First, the instant offense of conviction is a "covered sex crime" as that term is defined in Section 4B1.5(b) and application note 2. More specifically the defendant was convicted of two violations of 18 U.S.C. § 2423(a) (Counts Three and Four).[14] Title 18, United States Code, Section 2423(a) is an offense contained in Chapter 117 of Title 18 and thus is, by definition, a "covered sex crime." See Guideline Section 4B1.5(b) application note 2(iii).

Second, the defendant "engaged in . . . prohibited sexual conduct with a minor." The Sentencing Guidelines define "prohibited sexual conduct with a minor" to include any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B). See Guideline Section 4B1.5 application note 4(A)(I). Title 18, United States Code, Section 2426(b)(1)(A) encompasses offenses in Chapter 117 (which includes 18 U.S.C. § 2423) and Chapter 109A (which includes 18 U.S.C. § 2243). The defendant engaged in"prohibited sexual conduct" with a minor, under 18 U.S.C. § 2426(b)(1)(A), by transporting K.H. across state lines for purposes of prostitution (in violation of

---

[12]    Section 4B1.5(a) applies to repeat offenders against minors and Section 4B1.5(b) applies to what is termed "dangerous sex offenders" against minors. It is the second provision that is relevant here.

[13]    The defendant states that this enhancement does not apply because "[a]s the guideline makes clear, its purpose is to address pedophiles and compulsive sex offenders against children." Brice Memo Part II at 20. The defendant does not cite to any Guideline provision to support this claim as one does not exist. But, based on the evidence that the defendant had repeated sex with 14-year-old K.H. it is not inappropriate to characterize him as a pedophile and compulsive sex offender.

[14]    Count Three was charged in the original indictment as Count Five and Count of Conviction Four was charged in the original indictment as Count Six.

18 U.S.C. § 2423) and by engaging in sexual acts including sexual intercourse with 14-year-old

K.H. (in violation of 18 U.S.C. § 2243).

Third, Guideline Section 4B1.5(b) requires that a defendant"engaged in a pattern of

conduct" with respect to the prohibited sexual conduct with a minor. The Guidelines, application

note 4B(I), define a "pattern of conduct" to occur if "**on at least two separate occasions**, the

defendant engaged in prohibited sexual conduct with a minor" (emphasis added).[14]   The

evidence at trial was that on an almost daily basis the defendant had sexual intercourse with

K.H., and transported her across state lines, i.e., from D.C. to Maryland and back, for purposes of

prostitution.

Thus, all three criteria are met and the use of this enhancement is proper.

### B.    Neither The Ruling In United States v. Watts Nor Due Process Require Rejection Or Modification Of The PSR's Calculation

Defendant argues that even if the Court chooses to rely on acquitted conduct, "it may not

be used to increase Mr. Brice's sentence in the draconian manner contained in the PSR" without

violating his due process rights. Brice Memo Part II at 21. It is not clear what the defendant

means by this or how he suggests the court can use the evidence without violating his rights.

Presumably, though, Brice is suggesting that use of the acquitted conduct results in such an

increase that his due process right require a heightened standard of proof. The D.C. Circuit

recently noted in United States v. Dorcely, supra, that the Supreme Court in Watts "left open the

question whether a higher standard of proof might be necessary if relevant conduct dramatically

---

[14]    The Sentencing Guideline also are clear that "an occasion of prohibited sexual conduct" may be considered whether or not the occasion "occurred during the course of the instant offense," application note 4B(ii), which it did here.

increased the sentence." Id. at 373 n. 2.  156-57.  See also McMillan, 477 U.S. 79 (1986) (certain sentencing enhancements under the guidelines can fairly be characterized as "a tail which wags the dog of the substantive offense"); United States v. Long, 328 F.3d 655, 671 (D.C.Cir. 2003) (noting that some courts have required an heightened standard of proof in the "extreme" case).

However, this is simply not a case involving such an "extreme case" justifying a higher burden of proof to apply the 2G/2A cross reference.  As in Long, supra, the cross reference to 2A3.1 "operates to increase [the defendant's] base offense level on the basis of conduct closely related to the charged crimes and therefore the sentencing enhancement was not the tail that wagged the dog of the substantive offense." Id. at 671.  The evidence that the defendant used physical violence and threats to Shakita Proctor was admissible to proved the charged offenses in the evidence demonstrated how the defendant was able to discipline and control Shakita Proctor. A heightened standard of proof is not required.

If there court chooses to find that this is that "extreme" case, it can still apply the 2G/2A cross reference because there is clear and convincing evidence that the defendant forced Shakita Proctor to engage in commercial sexual acts.  See supra, Section II(A)(3), pp. 14-15.

**C.**     **The Factors Outlined In 18 U.S.C. § 3553(a) Support The PSR's Calculations**

The government, in its "Memorandum In Aid Of Sentencing" at pages 16-26, provides a lengthy analysis of the application of the factors set out in 18 U.S.C. § 3553(a) to the facts of this case.

Defendant's only objection to the government's analysis is that a life sentence, as recommended by the PSR, would be unwarranted because the only other case presenting similar facts that resulted in a life sentence involved a defendant, Carlos Curtis, with numerous prior

convictions, including a conviction for a prostitution-related crime.  Brice Memo Part II at 24-25.

It is true that Curtis, unlike Brice, had prior convictions and that Curtis prostituted a 12-year-old

girl compared to Brice's 14-year-old victim.  But unlike Curtis, Brice not only prostituted a

young juvenile, K.H., but he also repeatedly abused her sexually.  TT from September 27, 2006,

at 102-105.   Thus, although Curtis's crimes were in some ways more serious than Brice's, in

other ways they were less serious.  Nothing about the Curtis sentencing demonstrates in any way

that the recommended sentence is not appropriate.[15]

## CONCLUSION

Wherefore, based upon the foregoing, the Government respectfully requests that the

Court impose a significant sentence which is within a correctly calculated range under the U.S.

Sentencing Guidelines.

>Respectfully submitted,
>KENNETH L. WAINSTEIN
>United States Attorney
>D.C. Bar Number 451058


BY:

>_____
>SHARON MARCUS-KURN
>Assistant United States Attorney
>AZ Bar #10970
>555 4TH Street, N. W.
>Washington, D.C. 20530
>(202) 353-9462

---

[15]     Gary Gates, another case cited by Brice, is not applicable because, unlike Brice, Gates entered a very early plea, thus saving the government from the expense of having to try the case and the victims from having to suffer through the trauma of trial.

_____
MYESHA BRADEN
Trial Attorney
DC Bar No. 461485
Department of Justice
Criminal Division
1400 New York Avenue, NW
Suite 600
Washington, D.C.  20005